# EMPLOYMENT AGREEMENT

This Employment Agreement dated as of June 6th 2015 (the "Agreement"), is made by and between Turing Pharmaceuticals LLC. (together with any successor thereto, the "Company"), and Edward Painter (the "Executive") (collectively referred to as the "Parties").

In consideration of the mutual covenants herein contained and of the mutual benefits herein provided, the Company and the Executive agree as follows:

1.     **Employment.** The Company will employ the Executive and the Executive accepts continued employment by the Company on the terms and conditions herein contained for a period (the "Term") provided in Section 4.

2.     **Duties and Functions.**

        (a)     During the Term, the Executive shall serve as Head of Investor Relations of the Company reporting directly to the Chief Financial Officer of the Company. The Executive shall have such duties as determined by the Chief Financial Officer of the Company, and also have such other powers and duties as may be, from time to time, reasonably prescribed by the Chief Financial Officer of the Company. During the Term, the Executive shall devote substantially all his/her working time and efforts to the business and affairs of the Company. During the Term, the Company shall give the Executive appropriate support in the performance of his/her duties.

        (b)     The Executive agrees to observe and comply with the rules, policies and procedures of the Company as adopted in writing by the Company from time to time. The Executive may, so long as such activities do not interfere with his/her duties and responsibilities hereunder, invest, participate or engage in (for the Executive's own account or for the account of others), or may possess an interest in, other financial ventures and investment and professional activities of any kind or description, independently or with others, including (i) charities and passive investments, (ii) investment in, or the acquisition or disposition of, securities or real estate, (iii) investment and management counseling, (iv) the provision of brokerage and investment banking services and (v) serving as an officer, director, representative or agent of any entity, a partner of any partnership, or a trustee of any trust (and in each case may receive fees, commissions, remuneration, profits and reimbursement of expenses in connection with such ventures and activities), in each case provided that such Person does not expressly or implicitly represent that he/she is acting for the Company.

        (c)     The Executive will perform the services described herein from the Company's office in New York, New York, and the Executive shall travel to other locations as necessary for the performance of the Executive's duties and responsibilities hereunder.

3.     **Compensation and Benefits.**

        (a)     Base Salary. As compensation for his/her services hereunder, during the Term, the Executive shall receive a base salary at a rate of two hundred thousand Dollars ($200,000) per annum (the "Annual Base Salary"), which shall be paid in accordance with the

customary payroll practices of the Company. Such Annual Base Salary may be increased at the discretion of the Chief Executive Officer after each anniversary of the Effective Date. "Annual Base Salary" for all purposes herein shall be deemed to be a reference to the Annual Base Salary in effect as of any date that requires the determination of the Executive's Annual Base Salary hereunder.

(b)  Bonus. The Executive shall be eligible each fiscal year in which the Executive is employed to receive a target bonus of 25% of the Executive's Annual Base Salary (the "Bonus"), or a pro rata portion thereof for any partial fiscal year in which the Executive is employed by the Company, in any case subject to the sole discretion of the Executive Chairman. Any Bonus payable to the Executive pursuant to this Agreement shall be paid in full no later than March 31 of the following fiscal year.

(c)  Signing Bonus. In addition to the above Annual Bonus, the Executive shall be entitled to a one-time cash signing bonus in the amount of one hundred and sixty five thousand Dollars ($165,000), payable by the Company to the Executive to be paid with the first pay check as gross income and treated by the Company as taxable wages subject to withholding of all applicable taxes. If the Executive voluntarily terminates his/her employment prior to the completion of two years of service, the Executive will reimburse the Company according to the following rates and schedule: 100% if employed for less than 1 year; 67% if employed for 1-2 years; 33% if employed for 2-3 years.

(d)  Expenses. During the Term, the Company shall pay or reimburse the Executive for all reasonable travel and other business expenses incurred by him/her in the performance of his/her duties to the Company, in accordance with the Company's expense reimbursement policy in effect from time to time.

(e)  Vacation. During the Term, the Executive shall be entitled to unlimited paid vacation per calendar year in accordance with the Company's policy.

(f)  Equity. If and when a Long Term Incentive Program is approved by The Board, the Executive will be eligible to participate in the Share Option program.

(g)  Employee Benefits. During the Term, the Executive shall be entitled to participate in all employee benefit plans, programs, and arrangements that the Company provides for its employees and are generally applicable to executive employees of the Company, including, by way of illustration, personal leave, paid holidays, sick leave, profit-sharing, pension plans, 401(k) matching programs, retirement, disability, dental, vision, group healthcare coverage, group sickness, accident or family health insurance programs of the Company, subject, in each case, to the terms of each such program.

4.  Term. The initial term of employment under this Agreement (the "Initial Term") shall be for the period beginning on June 15th 2015 (the "Effective Date") and ending on the first anniversary thereof, unless earlier terminated as provided in Section 5. The employment term hereunder shall automatically be extended for successive one-year periods (collectively with the Initial Term, the "Term") unless either (a) the Executive gives notice of non-extension to the Company no later than thirty (30) days prior to the expiration of the then applicable Term and

subject to earlier termination as provided in Section 5, (b) the Executive is terminated pursuant to Section 5 of this Agreement or (c) the Company delivers notice to the Executive no later than thirty (30) days prior to the expiration of the then applicable Term that it does not elect to continue the Agreement.

5. **Termination of employment.** (a) The Company may immediately terminate the Executive's employment (i) at any time if the Executive is unable to perform, with or without reasonable accommodation, the essential functions of his/her position hereunder for a total of 180 consecutive days as a result of incapacity due to any medically determinable mental or physical illness; (ii) the Executive dies, or (iii) for "Cause" (as defined below). In such event, or in the event the Executive resigns without "Good Reason" (as defined below), the obligations of the Company shall cease immediately and the Executive shall not be entitled to any further payments of any kind, except for payment of his/her base salary through the date of termination, and reimbursement of any unpaid expenses (collectively, the "Accrued Obligations").

For purposes of this Agreement, "Cause" shall be defined as: (i) the Executive's willful or deliberate failure to perform his/her duties or gross negligence in the performance of his/her duties; (ii) the Executive's material breach of a material term of this Agreement; (iii) the Executive's dishonesty, willful misconduct or fraud in connection with his/her employment by the Company, the performance of his/her duties or in any way related to the business of the Company, which causes material harm to the Company; (iv) the Executive continually failing to perform the material duties of the terms of his/her employment; (v) the Executive being under the influence of drugs or alcohol (other than prescription medicine or other medically related drugs to the extent that they are taken in accordance with their directions) during the performance of his/her duties to the Company; (vi) a violation of any law relating to employment discrimination, harassment, or retaliation or any policy of the Company relating to employment discrimination, harassment or retaliation by the Executive; (vii) a reportable violation of any applicable banking, securities or commodities laws, rules or regulations by the Executive that constitutes a serious offense or that could or does result in a significant fine; (viii) the commission of any act of fraud, larceny, misappropriation of funds or embezzlement, conviction of a felony or a crime of moral depravity or a violation of law by the Executive that occurs in the course of his/her employment with the Company; (ix) the Executive engaging in conduct which is intentionally materially injurious to the business, reputation or goodwill of the Company; or (x) the Executive's material violation of applicable written policies, practices and standards of behavior of which the Executive has been made aware; provided, however, that before being terminated for Cause, the Executive shall be given notice of the actions underlying "Cause" and fifteen (15) days to cure same, if curable, before such termination shall be effective.

The Executive may resign his/her employment for "Good Reason". "Good Reason" means that the Company has engaged in any of the following without the Executive's written consent, unless such actions are cured by the Company within thirty (30) days following written notification by the Executive to the Company that the Executive intends to terminate employment for any of the following reasons: (i) a material diminution in the Executive's duties, authorities or responsibilities (other than temporarily while physically or mentally incapacitated); (ii) a material diminution in the Participant's base salary at the rate in effect immediately prior to the reduction; or (iii) relocation of the Executive's workplace to a location more than fifty (50) miles from New York City. The Executive shall provide the Company with a written notice

3

detailing the specific circumstances alleged to constitute Good Reason within 45 days after the first occurrence of such circumstances (or any claim of such circumstances as "Good Reason" shall be deemed irrevocably waived by the Executive), and in no event shall the Executive be entitled to resign for Good Reason more than 180 days following the occurrence of any event alleged to constitute Good Reason.

The Executive may resign his/her employment without "Good Reason" at any time; provided, however, if the Executive resigns his/her employment without "Good Reason" he/she shall forfeit any unvested stock grants or stock options that the Executive received and the Executive shall not be entitled to severance as set forth in Section 5(b) or any additional payments from the Company.

(b)     Payment for termination without "cause" and resignation with "Good Reason". The Company may immediately terminate the Executive's employment other than for Cause. In the event the Company terminates the Executive's employment other than for Cause or the Executive resigns his/her employment for "Good Reason", the Company shall pay the Executive $50,000 in severance (subject to withholding), plus reimbursement of any Accrued Obligations, payable within 60 days of termination.

(c)     Release. Except as otherwise set forth in this Section 5, the Executive understands and agrees that he/she is not entitled to any further payments of any kind from the Company upon termination, resignation or retirement from employment for any reason. Further, the Executive understands and agrees that no payments shall be made to the Executive pursuant to Section 5(b) unless the Executive first executes and does not revoke a release in form attached hereto as Exhibit A.

(d)     Section 409A. Notwithstanding anything to the contrary in this Agreement, any cash severance payments otherwise due to the Executive pursuant to this Section 5 or otherwise on or within the six-month period following the Executive's termination will accrue during such six-month period and will become payable in a lump sum payment on the date that is six (6) months and one (1) day following the Executive's termination. In addition, this Agreement will be deemed amended to the extent necessary to avoid imposition of any additional tax or income recognition prior to actual payment to the Executive under Section 409A of the Internal Revenue Code of 1986, as amended, and any temporary, proposed or final Treasury Regulations and guidance promulgated thereunder and the parties agree to cooperate with each other and to take reasonably necessary steps in this regard.

(e)     No Other Benefits. Except as otherwise expressly provided herein, the Executive shall not be entitled to any other salary, bonuses, employee benefits or compensation from the Company after the termination of the Term and all of the Executive's rights to salary, bonuses, employee benefits and other compensation hereunder which would have accrued or become payable after the date of termination shall cease and be forfeited upon such termination or expiration of the Term, other than those expressly required under applicable law (such as COBRA).

6.     Inventions/Work For Hire.     (a)     The Executive agrees to disclose to the Company all Inventions (as defined below) made, conceived, expressed, developed, or actually

4

or constructively reduced to practice by the Executive, whether solely or jointly with others, during his/her employment with the Company and in any way relating to the services, business, opportunities, or pursuits of the Company. "Inventions" shall mean all business plans, works of authorship, software (including, without limitation, source code(s)), databases, computer programs, designs, technologies, products, contraptions, ideas, discoveries, inventions, potential marketing and sales relationships, copyrightable expression(s), research, plans for products or services, marketing plans, know-how, trade secrets, data, developments, discoveries, systems, strategies and methodologies, improvements, modifications, technology, and algorithms, whether or not any such Invention is subject to patent or copyright protection.

(b)     The Inventions shall be the exclusive property of the Company. The Executive acknowledges that all Inventions shall be deemed "work made for hire" as defined under the U.S. Copyright Act of 1976, and for all other purposes. In the event that any competent authority determines that any such Invention is not a work made for hire, the Executive hereby assign, grant, and transfer to the Company, without any further consideration, all rights, title, interests, and other incidents of ownership, including, without limitation, any copyright, other intellectual property rights, moral rights, all contract and licensing rights, and all claims and causes of action of any kind with respect to such Inventions throughout the world and in perpetuity. The Company shall have the exclusive right to use the Inventions, whether original or derivative, for all purposes, without additional compensation to the Executive. The Executive agrees to sign and deliver such further instruments of transfer and ownership of the Inventions as the Company may reasonably request. At the Company's expense, the Executive will assist the Company in every proper way to perfect the Company's rights in the Inventions and protect the Inventions throughout the world including, without limitation, executing in favor of the Company or any designee(s) of the Company any and all patent, copyright, and other applications and assignments relating to the Inventions. The Executive agrees not to challenge the validity of the Company's (or its designee's) ownership of the Inventions. Nothing herein shall obligate the Company to use or publish the Inventions.

7.     **Non-Disparagement/Media.** (a) During the Executive's employment with the Company and thereafter, the Executive agrees not to make, publish, or communicate to any person or entity, any Disparaging remarks, comments, writings, or statements concerning the Company or any of its affiliates, officers, directors, clients, stockholders, employees, partners, vendors, contractors, or consultants. "Disparaging" remarks, comments, writings, and/or statements are those that impugn, criticize, or denigrate (a) the Company or any of its affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents and/or (b) the character, honesty, integrity, morality, business acumen, or abilities of the Company or any of its affiliates, officers, directors, clients, stockholders, employees, partners, vendors, contractors, or consultants. Nothing herein shall prevent Executive from providing truthful testimony if compelled by subpoena or court order to testify.

(b)     The Executive further agrees that during his/her employment and thereafter, he/she will not make any statement whatsoever to the press or media (including but not limited to any reporter, national, regional, or local newspaper, magazine, internet blog or site, news organization, or radio or television station) regarding any matter related to the Company, his/her employment with the Company, or any of the Company's affiliates, officers,

directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents. If at any time the Executive receives a request for any statement or information from the press or other media, the Executive will direct that request to the General Counsel of the Company and will say nothing further.

8.  **Company Property.**  All correspondence, records, documents, software, promotional materials, and other Company property, including all copies, which come into the Executive's possession by, through or in the course of his/her employment, regardless of the source and whether created by the Executive, are the sole and exclusive property of the Company, and immediately upon the termination of the Executive's employment, or any time at the Company's reasonable request, the Executive shall return to the Company all such property of the Company.

9.  **Non-Competition, Non-Solicitation.**

(a)  The Executive acknowledges and agrees with the Company that the Executive's services to the Company are unique in nature and that the Company would be irreparably damaged if the Executive were to provide similar services to any person or entity competing with the Company. Accordingly, the Executive covenants and agrees that during the term of this Agreement and, if Executive's employment is terminated for "Cause' or if the Executive resigns his/her employment without "Good Reason", for *one (1)* year thereafter (the "Restricted Period"), the Executive will not directly or indirectly through any agent, whether for his/her own account or for the account of any other individual, partnership, firm, corporation or other business organization (other than the Company or its affiliates) provide any service (including, but not limited to advisory or consulting related), directly or indirectly, or manage, operate, control, advise, consult, act as an agent or representative of, be employed by or otherwise assist any business or commercial entity in the design, development, manufacture, sale or commercial offering (whether or not in conjunction with other services that it performs) of any product or service related to (A) a molecule on which he worked for the Company or (B) a pre-clinical stage, clinical stage or commercial stage treatment of a disease for which the Company or its affiliates has either (1) filed an application for a patent, (2) obtained or received a license, sub-license, grant or transfer of rights or intellectual property or (3) commenced or initiated pre-clinical (including, but not limited to animal or similar testing) or clinical stage studies or trials (individually, or collectively, the "Field of Interest") or (ii) either on his own behalf or on behalf of any third party, except on behalf of the Company, directly or indirectly, as an individual proprietor, principal, manager, agent, consultant, guarantor, advisor, member, owner, participant, partner, stockholder, officer, employee, director, joint venturer, lender, or in any other capacity whatsoever (other than as a passive holder of not more than five percent (5%) of the total outstanding stock of a publicly-held company) participate in any business or commercial entity that engages in activities related to the Field of Interest or that is otherwise competitive with the Company. The Company may modify the definition of Field of Interest to include areas related to those currently included in the definition, by written notice to the Executive based on the activities in which the Company is then engaged or in which the Company has a bona fide intention to engage in during the period covered by this Section 9(a). The Executive shall, during the Restricted Period, notify the Company of any subsequent employment which he is scheduled to begin during the Restricted Period (stating the name and address of the employer and the nature of the position).

(b)    The Executive further agrees that during the term of this Agreement and for a period of *one (1) year* thereafter, the Executive shall not, without the express written consent of a duly authorized officer of the Company, directly or indirectly (i) induce or seek to influence any employee of (or consultant to) the Company to leave his/her employ (or terminate such consultancy) or to become financially interested in a similar business, or (ii) attempt to hire or aid a competitor or supplier of the Company in any attempt to hire a person who shall have been employed by, or who was a consultant to, the Company at any time within the one-year period preceding the date of any such attempt.

(c)    Nothing in this Section 9 will prohibit the Executive from (a) engaging in academic research or teaching, or using his/her skills and experience, in each case in compliance with the restrictions contained in this Agreement, or (b) holding up to five percent (5%) of the issued and outstanding securities of any class of securities of any entity that is publicly traded and quoted on a recognized securities exchange, so long as the Executive does not, directly or indirectly, exercise any management or control with respect to, or have any active participation in the business of, such entity.

(d)    The Executive acknowledges and agrees that the Company's business is worldwide and the covenants contained in subsections (a), (b) and (c) of Section 9 cannot be limited to any geographic area. The Executive acknowledges that the covenants in this Section 9 are reasonable in scope, area and duration and are necessary to further the Company's legitimate interests in protecting its Confidential Information and Confidential Materials, business, good-will and relationships with its customers, suppliers, advisors and employees.

(e)    The Executive and the Company agree that the covenants contained in this Section 9 are reasonable covenants under the circumstances, and further agree that if in the opinion of any court of competent jurisdiction such restraints are not reasonable in any respect, such court shall have the right, power and authority to excise or modify such provision or provisions of these covenants as to the court shall appear not reasonable and to enforce the remainder of the covenants as so amended.

(f)    The Executive also agrees that any breach of the covenants contained in this Section 9 would irreparably injure the Company. Accordingly, the Executive agrees that in the event of a breach of the covenants contained in this Section 9, the Company may, in addition to pursuing any other remedies it may have in law or in equity, cease making any payments or providing any benefits otherwise required by this Agreement and obtain an injunction against the Executive from any court having jurisdiction over the matter restraining any further violation of this Agreement by the Executive.

(g)    The provisions of Section 9 shall survive termination of this Agreement.

**10.    Protection of Confidential Information.**

(a)    For purposes of this Section 10, "Confidential Information" shall mean non-public information concerning the financial data, strategic business plans, product development (or other proprietary product data), projects, customer lists, marketing plans, methodologies, business or vendor relationships, relationships with strategic or business partners,

7

its high speed networks, or equipment, tools or other materials developed for use on such networks, and all information and know-how (whether or not patentable, copyrightable or otherwise able to be registered or protected under laws governing intellectual property) owned, possessed, or used by the Company, any affiliate or any customer, including, without limitation, any formula, method, procedures, composition, project, development, plan, market research, vendor information, customer or client lists or information, contacts at or knowledge of customers or clients, prospective customers and clients, business or strategic partners of the Company, trade secret, process, research, reports, financial data, technical data, test data, know-how, computer program, software, software documentation, source code, hardware design, technology, marketing or business plan, forecast, unpublished financial statement, budget, license, patent applications, contracts, joint ventures, price, cost and personnel data, any trade names, trademarks or slogans and other non-public, proprietary and confidential information of the Company, its affiliates or customers, that, in any case, is not otherwise available to the public (other than by the Executive's breach of the terms hereof). The Executive agrees (i) that all Confidential Information, whether or not in writing, shall be treated as being confidential and/or proprietary information and is the exclusive property of the Company and (ii) to hold in a fiduciary capacity for the sole benefit of the Company all Confidential Information.

(b)     Confidential Information shall not include information that (i) is or becomes public knowledge through legal means without fault by the Executive, (ii) is already public knowledge prior to disclosure, or (iii) must be disclosed pursuant to applicable law, regulation or court order.

(c)     The Executive agrees that he/she will not at any time, either during the Term of this Agreement or after his/her termination, disclose to anyone any Confidential Information, or utilize such Confidential Information for his/her own benefit, or for the benefit of third parties without written approval by the Board.  The Executive further agrees that all memoranda, notes, records, data, schematics, sketches, computer programs, prototypes, or written, photographic, magnetic or other documents or tangible objects compiled by him/her or made available to him/her during the Term of his/her employment concerning the business of the Company and/or its clients, including any copies of such materials, shall be the property of the Company and shall be delivered to the Company on the termination of his/her employment, or at any other time upon request of the Company.

(d)     The Executive also agrees that any breach of the covenants contained in this Section 10 would irreparably injure the Company.  Accordingly, the Executive agrees that in the event of a breach of the covenants contained in this Section 10, the Company may, in addition to pursuing any other remedies it may have in law or in equity, cease making any payments or providing any benefits otherwise required by this Agreement and obtain an injunction against the Executive from any court having jurisdiction over the matter restraining any further violation of this Agreement by the Executive.

11.   Indemnification.     The Executive shall be entitled to defense by and full indemnification from the Company for any claims that a third party brings against him/her based on any alleged act or omission related in any way to the Executive's employment by the Company to the maximum extent permitted under applicable law.  In addition, during the term of the Executive's employment, the Executive shall be covered under any directors' and officers'

8

liability insurance policy maintained by the Company and Company agrees to maintain appropriate directors' and officers' liability insurance policy covering Executive.

12. **Binding Agreement; Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties hereto, their heirs, personal representatives, successors and assigns. In the event the Company is acquired, is a non-surviving party in a merger, or transfers substantially all of its assets, this Agreement shall not be terminated and the transferee or surviving company shall be bound by the provisions of this Agreement. The parties understand that the obligations of the Executive are personal and may not be assigned by him/her.

13. **Entire Agreement.** This Agreement contains the entire understanding of the Executive and the Company with respect to employment of the Executive and supersedes any and all prior understandings, written or oral. This Agreement may not be amended, waived, discharged or terminated orally, but only by an instrument in writing, specifically identified as an amendment to this Agreement, and signed by all parties. By entering into this Agreement, the Executive certifies and acknowledges that he/she has carefully read all of the provisions of this Agreement and that he/she voluntarily and knowingly enters into said Agreement.

14. **Severability.** Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be deemed severable from the remainder of this Agreement, and the remaining provisions contained in this Agreement shall be construed to preserve to the maximum permissible extent the intent and purposes of this Agreement. Any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Any provisions determined to be invalid or unenforceable shall be deemed, without further action on the part of the parties hereto, amended and limited to the extent necessary to render the same valid and enforceable. In the event any ambiguity or question of intent or interpretation arises under this Agreement, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

15. **Governing Law; Arbitration.**

(a) This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

(b) Arbitration under this Arbitration Agreement ("Agreement") is governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.) ("FAA"). This Agreement applies to the Executive and the Company and survives the termination of Executive's employment with the Company. The Executive and the Company agree that any dispute or controversy, regardless of its date of accrual, covered by this Agreement or arising out of, relating to, or concerning the interpretation, construction, performance, validity, enforceability or breach of this Agreement, including any claim or dispute related to Executive's employment, shall be settled solely and exclusively by binding arbitration in New York, New York administered by JAMS. Such arbitration shall be conducted in accordance with the then prevailing JAMS Streamlined Arbitration Rules & Procedures, with the following exceptions to such rules if in conflict: (a) one

arbitrator shall be randomly chosen by JAMS; and (b) arbitration may proceed in the absence of any Party if written notice (pursuant to the JAMS' rules and regulations) of the proceedings has been given to such Party.

Except as it otherwise provides, this Agreement also applies, without limitation, to disputes arising out of or related to the employment relationship, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination or harassment and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and (a) covered by the Employee Retirement Income Security Act of 1974 or (b) funded by insurance), Affordable Care Act, Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, and all other state statutory and common law claims.

This Agreement does not prevent Executive from filing a complaint or charge with the U.S. Department of Labor, Equal Employment Opportunity Commission or National Labor Relations Board. Disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) are excluded from the coverage of this Agreement. The Company shall be fully responsible for and pay costs and expenses unique to arbitration, including without limitation the arbitrator's fees and all JAMS fees. The arbitrator may award only those remedies that would have applied had the matter been heard in court. The arbitrator shall issue a decision or award in writing, stating the essential findings of fact and conclusions of law. The arbitrator shall have no jurisdiction to issue any award contrary to or inconsistent with the law, including the statute at issue, and shall have no authority to add to, subtract from, or modify this Agreement. Judgment may be entered on the arbitrator's decision in any court having jurisdiction.

Either the Executive or the Company may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief. Nothing contained in this Agreement shall be construed to prevent or excuse Executive (either individually or in concert with others) or the Company from utilizing the Company's existing internal procedures for resolution of complaints, and this Agreement is not intended to be a substitute for the utilization of such procedures. This Arbitration section is the full and complete agreement relating to the formal resolution of disputes covered by this Agreement. In the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable.

The request for arbitration must be made within the time provided by the applicable statute of limitations.

The Parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrator shall be final and conclusive. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided, however, that nothing in this subsection shall be construed as precluding the bringing an action for injunctive relief as provided in Sections 9 and 10.

10

IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE OR IF THE PARTIES ARE SEEKING INJUNCTIVE OR EQUITABLE RELIEF AS PROVIDED ABOVE, THEN EACH PARTY, (i) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO, AND (ii) SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL OR STATE COURTS LOCATED IN NEW YORK COUNTY, NEW YORK AND EACH PARTY HERETO AGREES NOT TO INSTITUTE ANY SUCH ACTION OR PROCEEDING IN ANY OTHER COURT IN ANY OTHER JURISDICTION. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN THE COURTS REFERRED TO IN THIS SECTION 14.

16.    **Notices.**  Any notice or other communications required or permitted hereunder shall be in writing and shall be deemed effective (a) upon personal delivery, if delivered by hand and followed by notice by mail, e-mail or facsimile transmission, (b) three (3) days after the date of deposit in the mails, if mailed by certified or registered mail (return receipt requested), or (c) on the next business day, if mailed by an overnight mail service to the parties or sent by e-mail or facsimile transmission, as follows:

(a)    If to the Company:

Turing Pharmaceuticals LLC
1177 Avenue of the Americas, 39th Floor
New York, New York 10036
Attn: Chief Executive Officer

(b)    If to the Executive:

Ed Painter
544 King Street
Chappaqua, NY 10514

17.    **Miscellaneous.**

(a)    No delay or omission by either party in exercising any right under this Agreement shall operate as a waiver of that or any other right. A waiver or consent given by one party on any one occasion shall be effective only in that instance and shall not be construed as a bar or waiver of any right on any other occasion.

(b)    The captions of the sections of this Agreement are for convenience of reference only and in no way define, limit or affect the scope or substance of any section of this Agreement.

(c)     Any rights of the Executive hereunder shall be in addition to any rights the Executive may otherwise have under written benefit plans or agreements of the Company to which he/she is a party or in which he/she is a participant, including, but not limited to, any Company-sponsored written employee benefit plans, option plans, grants and agreements.

(d)     The Company shall be entitled to withhold from any amounts payable under this Agreement any federal, state, local or foreign withholding or other taxes or charges which the Company is required to withhold.

(e)     The Executive represents that he/she has had the opportunity to seek separate legal counsel of his/her own choosing in connection with the preparation, review and execution of this Agreement.

(f)     This Agreement may be executed in any number of counterparts, each of which shall constitute an original and all of which when taken together shall constitute one agreement.

(g)     Each party to this Agreement agrees promptly to execute, acknowledge, deliver, file or record such further certificates, amendments, instruments and documents, and to do all such other acts and things, as may be required by law, or that, in the opinion of the Company, may be necessary or advisable to carry out the intents and purposes of this Agreement.

[Signature page follows]

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement on the date first identified above.

COMPANY:

TURING PHARMACEUTICALS LLC

By: _____

     Name: Martin Shkreli
     Title: Executive Chairman

EXECUTIVE:

_____

Edward Painter