UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
EDWARD PAINTER

|  |  |  |
|---|---|---|
| | Plaintiff, | Index No: No. 17-CV-07558 (CBA)(LB) |
| v. | | |
| | | **AMENDED COMPLAINT** |

TURING PHARMACEUTICALS AG, TURING
PHARMACEUTICALS, LLC a/k/a VYERA
PHARMACEUTICALS, LLC, and MARTIN SHKRELI

**Jury Trial Demanded**

Defendants,
------------------------------------------------------------------------x

Plaintiff, Edward Painter, by and through his attorneys, Lally & Misir, LLP, as and for his Complaint against the Defendants herein, alleges, upon personal knowledge and upon information and belief as to all other matters:

## JURISDICTION AND VENUE

1. This is a civil action brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78(t)(a),  Rule 10b-5, codified at 17 CFR §240.10b-5, and other federal laws, New York state laws, and any other cause of action which can be inferred from the facts set forth herein, to redress Defendants' securities fraud upon the Plaintiff which has caused him to suffer significant losses and damages.

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

3. Venue is proper pursuant to 28 U.S.C. § 1391.

4. Plaintiff is entitled to a jury trial.

1

## PARTIES

5.   The Plaintiff, Edward Painter, is a resident of the State of New York and has his place of business in Nassau County, State of New York.

6.   At all times mentioned herein, the Defendant, Turing Pharmaceuticals AG ("Turing") is a Swiss Corporation, doing business and maintaining offices in New York, under the trademark names of "Turing" and "Vyera" Pharmaceuticals.

7.   That at all times mentioned herein, the Defendant, Martin Shkreli, is a resident of the State of New York.

8.   That at all times mentioned herein, Turing Pharmaceuticals, LLC and Vyera Pharmaceuticals, LLC are trademarks and operate under Turing Pharmaceuticals AG.

## STATEMENT OF RELEVANT FACTS

9.   Defendant Shkreli has engaged in a pattern and practice of securities and stock fraud for over a decade, and was convicted of violation of SEC Rule 10(b)(5), for which he is currently serving time in prison.

10.   Defendant Shkreil's *modus operandi* is to make fraudulent representations about business opportunities and returns to induce and defraud investors into making substantial investments into those enterprises, and to transfer and utilize assets from one company to another to cover promised returns in a Ponzi like scheme.

11.   The Defendants engaged in exactly that scheme to defraud Plaintiff of his family's saving in this action.

2

<u>Defendant Shkreli's Criminal Violation of SEC Rule 10(b)(5)</u>

12.  In 2015, Defendant Shkreli was indicted and subsequently found guilty in the Eastern District of New York for Securities Fraud and Conspiracy to Commit Securities Fraud for acts involving MSMB Capital, MSMB Healthcare, hedge funds focused on investments in the healthcare sector, and Retrophin, a biopharmaceutical company.

13.  In particular, Defendant Shkreli was found guilty of having employed, in violation of SEC Rule 10(b)(5), deceptive devices and schemes to defraud, made untrue statements of material fact, and engaged in fraud upon the investors of MSMB Capital, MSMB Healthcare.  In addition, Defendant Shkreli was found guilty of conspiracy with his attorney Evan Greebel, who was also counsel to MSMB Capital and MSMB Healthcare and Retrophin, to engage in deceptive devices and schemes to defraud, make untrue statements of material fact, and engage in fraud upon the investors of Retrophin.

14.  In its Order of Judgment, the court ordered Defendant Shkreli to forfeit to the United States, his interest in Vyera Pharmaceuticals, formerly known as Turing Pharmaceuticals.

15.  On March 5, 2018, the Government filed a Preliminary Order of Forfeiture requesting that the execution of the order and seizure of substitute assets be stayed until the final disposition of any appeal pursuant to Federal Rules of Civil Procedure 32.2.(d).

16.  Defendant Shkreli is required to preserve the assets of Turing. If Defendant Martin Shkreli fails to uphold any condition of the Preliminary Order of Forfeiture the Government may seize the Substitute assets, up to the amount of the Forfeiture Money Judgment.

17.  Defendant Shkreli duly filed an appeal with the Second Circuit Court of Appeals, which remains pending.

<u>Defendant Shkreli's History of Ponzi-like Schemes</u>

18.  Defendant Shkreli has engaged in a pattern and practice of securities and stock fraud for over a decade,

19.  In 2009, Defendant Shkreli founded MSMB Capital Management, a hedge fund focused on trading pharmaceutical and biotech companies.

20.  In 2011, MSMB Capital initiated a short sale of 32 million shares of Orexigen Therapeutics stock. The short resulted in a loss.

21.  MSMB Capital had traded through Merrill Lynch and made representations that MSMB Capital had sufficient funds to cover a loss. MSMB Capital was unable to cover its position with Merrill Lynch and its assets were almost wiped out. The trade cost Merrill Lynch seven million dollars ($7,000,000.00).

22.  Defendant Shkreli created MSMB Healthcare and Retrophin in 2011, shortly after the Orexigen loss.

23.  In 2014, Defendant Shkreli was removed from Retrophin's Board of Directors, and shortly thereafter the Board initiated a lawsuit against him.

24.  Defendant Shkreli was accused by the Board of Retrophin of looting Retrophin of tens of thousands of shares of stock and cash to give to his investors from these prior companies MSMB Capital and MSMB Healthcare, whom he had previously defrauded.  Retrophin paid over $2,700,000 and issued over 590,000 shares to appease MSMB investors.

25.  Defendant Shkreli then went on to found Turing Pharmaceuticals and served as its Chief Executive Officer.

26.  In August 2015, Turing obtained the drug Daraprim, which treats toxoplasmosis in HIV positive patients.  Defendant Shkreli increased the price of the drug by 5000%.

27.   Also in 2015, Defendant Shkreli  acquired a majority interest in KaloBios.

28.   In 2016, Defendant Shkreli was fired as CEO by the Board of Directors of Turing.

29.   In 2017, Defendant Shkreli then took back control of Turing using artificial "voting shares" to boost his then 24% minority share interest, and ousted the "disloyal" executives of Turing who had fired him.

Defendants' Scheme to Defraud Mr. Painter of his Family Savings of $275,000,

and Commissions from the Savant Deal

30.   The Defendants engaged in a scheme to deprive Plaintiff Edward Painter of $275,000 of his family savings by inducing him to invest into Turing and KaloBios which later declared bankruptcy, and to deprive him of the commissions owed to Plaintiff Painter for securing exclusive rights to the Chagas disease drug Benznidazole from Savant HWP, Inc., a pharmaceutical company ("the Savant deal").

31.   Plaintiff Painter was a local business executive who became acquainted with Defendant Shkreli in New York.

32.   In November 2014, Plaintiff Painter brought to Defendant Shkreli and Patrick Crutcher, head of Turing's business development at the time, a potential exclusive right to market the Chagas disease drug, which was owned and developed by Savant HWP, Inc. ("Savant").

33.   The Defendants agreed to pay Plaintiff Painter a 5% commission on gross sales, if the exclusive deal was closed ("the Savant deal").  Such commissions were expected to be in excess of one million ($1,000,000.00) dollars.

34.   On or about June 6, 2015, Plaintiff Painter entered into an employment agreement with Turing.  Plaintiff Painter was employed as Director of Investor Relations at Turing.

35. In July of 2015, three (3) weeks after being hired by Turing, Plaintiff Painter was pressured and directed by management of Turing, including the CEO – Defendant Shkreli, to invest $150,000.00 of his personal family funds, into Turing.

36. Plaintiff Painter was told that if he did not invest the funds, his job would be in jeopardy.

37. Plaintiff Painter invested the funds and never received the securities from Turing.

38. In August 2015, at Plaintiff Painter again raised the Savant deal with the Defendants, and was, again, promised by the Defendants that he would receive a 5% commission on all sales of the Chagas disease drug if he secured the rights with Savant.

39. In or about the Fall of 2015, Turing acquired the Savant deal.

40. In September 2015, Defendant Shkreli, also acquired the drug Daraprim, used in treatment of HIV/AIDs patients. Defendants raised the price of the drug by 5,000% - from $13.50 to $750 per tablet.

41. The enormous price increased affecting a vulnerable population caused massive social outrage resulting in the devaluation of Turing stock – Plaintiff's and shareholders' investments.

42. Prior to the acquisition of Daraprim, the Defendants specifically represented to the Plaintiff Painter, and other Turing investors that the acquisition of the drug, Daraprim, would not be accompanied by an extraordinary increase in the price of the drug.

43. On or about November 2015, Defendant Shkreli purchased and was named as the Chief Executive Officer of KaloBios Pharmaceutical ("KaloBios") company.

44. At the time of the purchase of KaloBios, Defendants made false representations to Plaintiff Painter, to wit, Defendants represented that the KaloBios acquisition would not impact

Defendants' time or management of Turing, because Shkreli would be selling his shares of KaloBios back to Turing, at cost, and KaloBios would become a subsidiary of Turing.

45. In addition, Defendants promised that the Savant deal would remain in Turing to be managed by the new KaloBios subsidiary of Turing.

46. At the same time, Defendants Shkreli and Turing pressured Plaintiff Painter to make an additional $125,000 investment of Painter's family savings, into KaloBios.

47. This was a lie by Defendants.

48. Defendant Shkreli never intended to merge KaloBios.

49. Defendants transferred the Savant Deal to KaloBios, for no consideration.

50. On December 3, 2015, Defendants announced that KaloBios had acquired the Savant deal – and pumped the stock with huge media coverage.

51. At the same time, Defendant Shkreli again agreed to pay Plaintiff Painter his 5% commission on the Savant deal in front of three (3) Turing employees – Eliseo Salinas, Michael Smith, and Sridhar Vempati.

52. KaloBios stock soared by 42% in one day.  Defendant Shkreli then sold his KaloBios stock for a profit of over $1,000,000.00 in a classic "Pump and Dump" scheme.

53. Turing got nothing, and Plaintiff Painter got nothing.  Two months later KaloBios filed for bankruptcy.

54. Plaintiff Painter never received his 5% commission in the Savant Deal, or any other compensation for his $125,000 investment in KaloBios.

55. In December 2015, Mr. Shkreli was arrested by the FBI pursuant to a federal indictment in the U.S. District Court for the Eastern District of New York filed against him, charging him with securities fraud.

56.   Mr. Shkreli's fraud was described by the U.S. Attorney, as a, "Ponzi-style scheme involved recycling money from new investors and passing it off to other investors in the guise of profits, or giving it to dissatisfied investors who had asked for their money back."

57.   Following his arrest, Defendant Shkreli was fired as CEO of KaloBios.

58.   In February 2016, Defendant Shkreli was fired as CEO of Turing.

59.   In September 2017, Turing Pharmaceuticals LLC changed its name to Vyera Pharmaceuticals.


### AS AND FOR THE FIRST CAUSE OF ACTION – SECURITIES FRAUD IN VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934

60.   Plaintiff incorporates by reference the allegations set forth in the proceeding paragraphs of the Complaint as though set forth at length herein.

61.   This claim is authorized and instituted pursuant to Section 10(b) of the Securities Exchange Act, Rule 10b-5, based upon the actions of the Defendants.

62.   Specifically, Plaintiff complains that the Defendants made material misrepresentations and omissions to induce investments by the Plaintiff in its securities causing him to suffer substantial injury and damages.

63.   "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which

operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."   17 CFR 240.10b-5

64. To state a claim for violation of Securities Exchange Act § 10(b), a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Charles Schwab Corporation v. Bank of America Corporation, 883 F.3d 68, 92 (2d Cir. 2018); Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 267 (2014) (internal quotation marks omitted)

65. Scienter is "a mental state embracing the intent to deceive, manipulate, or defraud. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007); quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-194 (1976).

66. The Defendants induced Plaintiff Painter to invest in Turing's stocks by making material misrepresentations and omissions about the performance of Turing and its assets.

67. The Defendants also induced investments by the Plaintiff by making material misrepresentations and omissions regarding its CEO, Martin Shkreli, as being a successful hedge fund founder and manager.  The Defendants were running a fraudulent investor scheme by taking money from new investors and passing it off to other investors in the guise of profits.

68. The Defendants falsely represented to the Plaintiff numerous times - including November 2014, August 2015, November 2015 and December 2015 - that he would receive 5% commissions on all revenues from the acquisition and sale of the Savant Deal.

69.    The Defendants transferred the Savant Deal to KaloBios.   Neither KaloBios, nor the
       Defendants, made any compensation to Turing for the value of the transaction, and did not
       compensate Plaintiff for the loss of actual and potential commissions.

70.    The Defendant Shkreli, personally benefitted from the KaloBios transaction with Savant.
       Upon information and belief, Defendant Shkreli had purchased KaloBios stock for nominal
       value, and after the Savant deal he sold his stocks in KaloBios for over one million
       ($1,000,000.00) dollars.

71.    The Defendants knowingly falsely represented to Plaintiff Painter, that Defendant Shkreli
       would dedicate 100% of his time to building Turing Pharmaceuticals.   This was not true.
       Instead, the Defendants were misappropriating Turing resources for the Defendant
       Shkreli's, own benefit.

72.    The Defendants made fraudulent statements to the Plaintiff, Mr. Painter, and other Turing
       investors including: 1) that Defendant Shkreli was making a commitment to sell all of his
       personal KaloBios stock to Turing at the price he paid; 2) that Defendant Shkreli was
       making a commitment to compensate Turing for any value transferred from to KaloBios
       from Turing.   These statements were false.

73.    The Plaintiff, Mr. Painter, reasonably relied on the misrepresentations of the Defendant,
       Turing, and invested $275,000.00 of his personal funds into Turing and Defendants never
       delivered the securities.

74.    The Plaintiff, Mr. Painter, suffered monetary damages in the loss of expected income, loss
       of commission earned, and loss of investments in securities.

## AS AND FOR A SECOND CAUSE OF ACTION – SECURITIES FRAUD IN VIOLATION OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

75.   Plaintiff incorporates by reference the allegations set forth in the proceeding paragraphs of the Complaint as though set forth at length herein.

76.   This claim is authorized pursuant to 15 U.S.C §78t.

77.   Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with and to the same extent as such controlled person" unless the purported control person can demonstrate that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t.

78.   In order to state a control person claim pursuant to section 20(a), Plaintiffs must allege facts showing (1) "a primary violation by the controlled person," (2) "control of the primary violator by the targeted defendant," and (3) that the "controlling person was in some meaningful sense a culpable participant in the fraud perpetrated." In re Beacon Associates Litigation, 645 F.Supp.2d 386, 411 (S.D.N.Y. Oct. 5, 2010); ATSI Commc'ns Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (N.Y. 2007) (internal quotation marks omitted).

79.   A finding of "control" under the second prong requires a fact-intensive inquiry into the "power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." In re Beacon Associates Litigation, 645 F.Supp.2d 386, 411 (S.D.N.Y. Oct. 5, 2010).

80.   Control person liability need not be pleaded with particularity and is generally analyzed under the "short and plain" statement analysis of Rule 8(a). In re Bristol Meyers Squibb Co. Securities Litigation, 586 F.Supp.2d 148, 171 (S.D.N.Y. Aug. 20, 2008); See Sedona

Corp. v. Ladenburg Thalmann & Co., Inc., No. 03 Civ. 3120(LTS)(THK), 2005 WL

1902780, at *16 (S.D.N.Y. Aug. 9, 2005)

## AS AND FOR A THIRD CAUSE OF ACTION – VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS 18 U.S.C.A § 1962.

81. 18 U.S.C. § 1962(a) makes it unlawful for any person who has received any income from a

pattern of racketeering to use or invest any part of that income in the acquisition of,

establishment of, or operation of any enterprise engaged in or affected interstate or

international commerce. 18 U.S.C. § 1962(a)

82. "Any person injured in his business or property by reason of a violation of section 1962 of

this chapter may sue therefor in any appropriate United States district court and recover

threefold the damages he sustains and the cost of the suit." 18 U.S.C. 1964 (c).

83. A party asserting Civil RICO claims may assert "an action against any person that is

criminally convicted in connection with the fraud." 18 U.S.C. § 1964 (c).

84. "Racketeering activity" means (amongst other things) engaging in fraud in the sale of

securities. Kottler v. Deutsche Bank AG, 607 F.Supp.2d 447, 458 (S.D.N.Y. Jan. 9, 2009);

18 U.S.C. § 1961 (1)(D).

85. A pattern of "racketeering activity" requires "at least two acts of racketeering activity, one

of which occurred after the effective date of this chapter and the last of which occurred

within ten years after the commission of a prior act of racketeering activity." 18 U.S.C. §

1961 (5).

86. At all times relevant in this action, Defendant Turing is an "enterprise" as defined in 18

U.S.C. § 1961 (4).

87.   Such an enterprise "must have a 'structure' exhibiting three features: a purpose, relationships among the individuals associated with the enterprise, and longevity sufficient to permit the associates to pursue the purpose of the enterprise." Dennis v. JPMorgan Chase & Co., 343 F.Supp.3d 122, 184 (S.D.N.Y. Nov. 26, 2018).

88.   Defendant Shkreli has been convicted of two (2) counts of securities fraud and one count of conspiracy to commit securities fraud for the same pattern and practice of conduct that he engaged in defrauding the Plaintiff here, Edward Painter.

### AS AND FOR THE FOURTH CAUSE OF ACTION– BREACH OF CONTRACT FOR THE AGREEMENT OF A 5% COMMISSION ON THE SALE OF DRUGS RESULTING FROM THE SAVANT DEAL

89.   The elements of a cause of action for breach of contract are (1) formation of a contract between plaintiff and defendant, (2) performance by plaintiff, (3) defendant's failure to perform, (4) resulting damage, Palmetto Partners, L.P. v. AJW Qualified Partners, LLC, 83 AD3d 804, 921 NYS2d 260 (2d Dept 2011); JP Morgan Chase v. J.H. Elec. of New York, Inc., 69 AD3d 802, 893 NYS2d 237 (2d Dept 2010).

90.   To plead a breach of contract claim, the claimant must allege the provisions of the contract upon which the claim is based, Sud v. Sud, 211 AD2d 423, 621 NYS2d 37 (1st Dept 1995); Atkinson v. Mobil Oil Corp., 205 AD2d 719, 614 NYS2d 36 (2d Dept 1994). There is no requirement, however, that a breach of contract action be pleaded with the same particularity as a fraud claim, Vandashield Ltd. v. Isaacson, 146 AD3d 552, 46 NYS3d 18 (1st Dept 2017).

91.   Plaintiff, Mr. Painter, introduced Savant to Defendant Turing in November 2014. Plaintiff had a personal relationship with Savant's management and was the intermediary of the Savant-Turing deal.

92.   Initial conversations between Savant and Defendant Turing included a promise to Plaintiff that he would receive 5% commission on the sales of the Chagas disease drug Benznidazole for his role in arranging the Savant-Turing deal.

93.   Negotiations between Savant and Defendant Turing to acquire Benznidazole commenced again on or about August 2015.  Turing again made a promise to Plaintiff that he would receive 5% of all sales of the Chagas disease drug Benznidazole.

94.   Defendants yet again assured Plaintiff that he would receive the 5% commission on sales of the drug December 2015.

95.   Defendants failed to follow through with their promise to pay Plaintiff 5% commission on the sales of the drug, and the Savant Deal was transferred to KaloBios for no consideration as part of a "Pump and Dump" scheme for the personal enrichment of Defendant Shkreli. Plaintiff has not received a single cent of commission due to him to date.

## AS AND FOR THE FIFTH CAUSE OF ACTION – BREACH OF CONTRACT FOR THE SECURITIES EXCHANGE AGREEMENT BETWEEN PLAINTIFF AND DEFENDANTS FOR $150,000 INTEREST IN TURING

96.   In July of 2015, three (3) weeks after being hired by Turing, Mr. Painter was pressured and directed by management of Turing, including the CEO - Defendant Shkreli, to invest $150,000.00 of his personal family funds, into Turing.

97.   Plaintiff Painter did give to Defendant Shkreli the $150,000 to invest in Turing.

98.   Plaintiff Painter, in return for his investment into Turing, a private, closely-held corporation, expected to receive something of equivalent value, whether that be stock or an interest in Turing.

99.   Defendants provided Plaintiff with nothing in exchange for his $150,000 investment into Turing.

100.  Plaintiff, Mr. Painter, fulfilled his obligation under the exchange agreement and tendered $150,000 to  Defendant Turing.

101.  Defendant Turing failed to fulfill their obligation to provide Plaintiff, Mr. Painter, with securities of equivalent value in exchange for Plaintiff's investment.

## AS AND FOR THE SIXTH CAUSE OF ACTION – BREACH OF CONTRACT FOR THE SALE OF SECURITIES BETWEEN PLAINTIFF AND DEFENDANTS FOR $125,000 INTEREST IN KALOBIOS

102.  Plaintiff incorporates by reference the allegations set forth in the proceeding paragraphs of the Complaint as though set forth at length herein.

103.  Plaintiff, Mr. Painter, was employed by Turing from approximately June 2015, to February, 2016.

104.  In December 2015, Defendant Martin Shkreli again demanded that Plaintiff invest $125,000 into KaloBios. KaloBios is a pharmaceutical/biotech company that Defendants acquired in December 2015.

105.  Plaintiff, Mr. Painter, gave Defendants $125,000. Defendants accepted Plaintiff's money and gave nothing in return.

106.  As an investment, Plaintiff had an expectation that he would receive stock or some other interest in KaloBios. Defendants never tendered any security or interest in KaloBios to Plaintiff for the money Plaintiff gave to Defendants as an investment.

107.  Plaintiff satisfied his obligation and tendered the $125,000 as required by the investment agreement between Defendants and himself.

108.  Defendants did not satisfy their obligation to tender to Plaintiff stock or other interests in KaloBios.

109.  Defendants have not, to date, provided Plaintiff his initial investment or returns on his investment.

## AS AND FOR THE SEVENTH CAUSE OF ACTION – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

110.  Plaintiff incorporates by reference the allegations set forth in the proceeding paragraphs of the Complaint as though set forth at length herein.

111.  This claim is authorized and instituted pursuant to New York law, based upon the tortious actions of the Defendants.  Specifically, Mr. Painter complains that Defendants breached the covenant of good faith and fair dealing implied in Mr. Painter's purchase of Turing and KaloBios securities, causing him to suffer substantial injury and damages.

112.  "Under New York law, there is a covenant of good faith and fair dealing implied in all contracts." 511 West 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153, 773 N.E.2d 496, 746 N.Y.S.2d 131 (2002).  "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, and may thus be breached by conduct not expressly forbidden by any contractual provision." P.T.& L. Contr. Corp. v. Trataros Constr., Inc., 29 A.D.3d 763, 816 N.Y.S.2d 508 (2d Dep't 2006); See Hbouss v. Coca-Cola Enters., 2006 U.S. Dist. LEXIS 54958, 2006 WL 2285598 (S.D.N.Y. Aug. 9, 2006); See also Travelers Indem.  Co. v. CDL Hotels USA, Inc., 322 F. Supp. 2d 482, 2004 U.S. Dist. LEXIS 11381 (S.D.N.Y. 2004).

113.  The Defendants breached their duty of good-faith and fair dealing.

114.  The Defendants continually led Mr. Painter on, with fraudulent misrepresentations.

115.  Defendant lied to Plaintiff to induce Plaintiff to give him and Turing the Savant deal.

116. Defendant Shkreli lied to Plaintiff to induce him to give Defendants, $150,000 of Plaintiff's family's money.

117. Defendant lied to Plaintiff to induce him to give Defendants, $125,000 of Plaintiff's family's money, which Defendant Shkreli then invested in KaloBios – a company Defendant Shkreli controlled and later looted.

118. The Defendants injured the Plaintiff's right to the income, delivery of securities, and commissions that he was obligated to receive.

119. The Defendants breach of the covenant of good faith and fair dealing – refusing delivery of securities - caused the Plaintiff financial loss and difficulties.


## AS AND FOR THE EIGHTH CAUSE OF ACTION – FRAUD AND MISREPRESENTATION


120. Plaintiff incorporates by reference the allegations set forth in the proceeding paragraphs of the Complaint as though set forth at length herein.

121. This claim is authorized and instituted pursuant to New York law, based upon the tortious actions of Defendant Turing.  Specifically, Mr. Painter complains of Defendant Turing knowing misrepresentations of material facts with the intent to deceive him, and that upon his reliance on those facts, he suffered pecuniary loss.  See Clearmont Prop., LLC v. Eisner, 58 A.D.3d 1052, 1053, 872 N.Y.S.2d 725, 727, 2009 N.Y. App. Div. LEXIS 286, *1, 2009 NY Slip Op 292, 1 (N.Y. App. Div. 3d Dep't 2009).

122. The Plaintiff, Mr. Painter, gave $275,000.00 of his personal funds into the Defendant, Turing.

17

123. The Defendants made material fraudulent statements and omissions concerning Turing's CEO, Mr. Shkreli, and his experience with running two (2) hedge funds. Mr. Shkreli was not successful in operating his hedge funds, MSMB Capital and MSMB Healthcare, rather he was running a Ponzi-scheme fraud. He was convicted of securities fraud in Federal Court in the Eastern District of New York in August 2017.

124. The Defendants falsely represented to the Plaintiff numerous times - including November 2014, August 2015, November 2015 and December 2015 - that he would receive 5% commission on all sales of the Chagas disease drug Benznidazole, which was expected to be over one million ($1,000,000.00) dollars.

125. The Defendants transferred the Savant Deal to KaloBios without consideration. Neither KaloBios, nor the Defendants, made any compensation to Turing – or to the Plaintiff - for the value of the transaction.

126. The Defendant Shkreli, personally benefitted from the KaloBios transaction with Savant. Upon information and belief, Defendant Shkreli purchased KaloBios stock for nominal value, and after the Savant Deal transfer to KaloBios caused KaloBios stock to soar, he withdrew cash and sold his stocks in KaloBios for over one million ($1,000,000.00) dollars.

127. The Defendants falsely represented to Plaintiff Painter, that Defendant Shkreli would dedicate 100% of his time to building Turing Pharmaceuticals. This was not true. Instead, the Defendants were misappropriating Turing resources for Defendant Shkreli's, own benefit.

128. The Defendants made fraudulent statements to Plaintiff Painter, and other Turing investors including: 1) that Defendant Shkreli was making a commitment to sell all of his personal

KaloBios stock back to Turing, at the price he paid; 2) that Defendant Shkreli was making a commitment to compensate Turing for any value transferred to KaloBios from Turing. These statements were false, and fraudulently made to induce Plaintiff to trust his family's money to Defendants.

129. That the Defendants were running a Ponzi scheme fraud, which involved recycling money from new investors, and passing it off to other investors in the guise of profits.

130. That as a result of the Defendants' fraud, the Plaintiff suffered monetary damages in the loss of prosepective commissions, and loss of investments in securities.

## AS AND FOR THE NINTH CAUSE OF ACTION – NEGLIGENT MISREPRESENTATION

131. Plaintiff incorporates by reference the allegations set forth in the proceeding paragraphs of the Complaint as though set forth at length herein.

132. This claim is authorized and instituted pursuant to New York law, based upon the tortious actions of Defendants.

133. The Plaintiff Painter gave $275,000.00 of his family's savings to the Defendants as an investment into Defendant Turing and KaloBios.

134. The Defendants made material fraudulent statements and omissions concerning Defendant Shkreli, and his experience with running two (2) hedge funds.  Defendant Shkreli was not successful in operating his hedge funds, MSMB Capital and MSMB Healthcare, rather he was running a Ponzi-scheme fraud.  He was convicted of securities fraud in the Eastern District of New York in August 2017.

135. The Defendants had a special duty to the Plaintiff – an investor in Turing's stocks – to provide correct information as to investments in Turing.

136.  The Defendants falsely represented to the Plaintiff on numerous times - including November 2014, August 2015, November 2015 and December 2015 - that he would receive 5% commission on all sales of the Chagas disease drug Benznidazole from Savant, which was expected to amount to over one million ($1,000,000.00) dollars.

137.  The Defendants transferred the Savant Deal to KaloBios for no consideration.  Neither KaloBios, nor the Defendants, made any compensation to Plaintiff Painter for the value of the transaction.

138.  The Defendant Shkreli personally benefitted from the KaloBios transaction with Savant. Upon information and belief, Defendant Shkreli purchased KaloBios stock for nominal value, and after the Savant Deal he sold his stocks in KaloBios for over one million ($1,000,000.00) dollars.

139.  The Defendants falsely represented to Plaintiff Painter, that Defendant Shkreli would dedicate 100% of his time to building Turing Pharmaceuticals.  This was not true.  Instead, Defendant Shkreli was misappropriating Turing resources for his own benefit.

140.  The Defendants made fraudulent statements to the Plaintiff Painter, and other Turing investors including: 1) that Defendant Shkreli was making a commitment to sell all of his personal KaloBios stock to Turing at the price he paid; 2) that Defendant Shkreli was making a commitment to compensate Turing for any value transferred to KaloBios from Turing.  These statements were false and fraudulently made to induce Plaintiff Painter to give his family's money to Defendants

141.  That the Defendants were running a Ponzi scheme fraud, which involved recycling money from new investors, and passing it off to other investors in the guise of profits.

142. That as a result of the Defendants' fraud, the Plaintiff Painter suffered monetary damages from the loss of expected commissions, and loss of investments in securities.

## AS AND FOR THE TENTH CAUSE OF ACTION – BREACH OF FIDUCIARY DUTIES

143. Plaintiff Painter incorporates by reference the allegations set forth in the proceeding paragraphs of the Complaint as though set forth at length herein.

144. This claim is authorized and instituted pursuant to New York law, based upon the tortious actions of Defendants.

145. Specifically, Mr. Painter complains that the Defendants had a fiduciary duty to the Plaintiff, and the Defendants' misconduct – securities fraud, fraudulent misrepresentations, negligent misrepresentations, and breach of contract – resulted in Plaintiff Painter suffering significant monetary damages.   See Kurtzman v. Bergstol, 40 A.D.3d 588, 590, 835 N.Y.S.2d 644 (2nd Dep't 2007); see also Pokoik v. Pokoik, 982 N.Y.S.2d 67, 70, 115 A.D.3d 428 (1st Dep't 2014).

146. The Defendants had a fiduciary relationship to Plaintiff Painter based upon his investments totaling $275,000.00.

147. The Defendants had a duty to provide Plaintiff Painter with correct information, and to use the investments prudently.  Instead Defendants, breached their fiduciary duties, and used Plaintiff Painter's investments to personally enrich Defendant Shkreli and Turing.

148. The Defendants breached their fiduciaries duties to Plaintiff Painter, by knowingly making continuous fraudulent and negligent misrepresentations to him.

149. That as a result of the Defendants' breach of fiduciary duties, Plaintiff Painter suffered monetary damages in the loss of expected commissions, and loss of investments in securities.

### AS AND FOR THE ELEVENTH CAUSE OF ACTION – UNJUST ENRICHMENT

150. Plaintiff incorporates by reference the allegations set forth in the proceeding paragraphs of the Complaint as though set forth at length herein.

151. This claim is authorized and instituted by New York State Law, based upon the tortious actions of Defendants.

152. Plaintiff Painter introduced Defendants to Savant, the manufacturer of the Chagas disease drug Benznidazole. Defendants made promises and representations to Plaintiff Painter that he would receive a 5% commission on all sales of the drug upon acquisition of the exclusive rights to the drug from Savant.  Despite, Plaintiff Painter's successful acquisition of the exclusive rights on behalf of Defendants, he was not paid any commissions and the rights to the drug were transferred by Defendants to KaloBios for no consideration.

153. Plaintiff Painter complains that Defendants took his two hundred seventy-five thousand dollars ($275,000.00) as investment. Plaintiff Painter was tricked into giving Defendant Shkreli a $150,000 investment for Turing and a $125,000 investment in KaloBios.

154. Plaintiff Painter was promised stock in exchange for his required investment. The securities promised were never delivered to Plaintiff Painter.

155. Plaintiff Painter did not receive his promised 5% commission.

156. An action for unjust enrichment requires a showing by the plaintiff that: "(1) the other party was enriched, (2) at plaintiff's expense, and (3) that is it against equity and good conscience to permit the other party to retain what is sought to be recovered." Georgia Malone & Co., Inc., v. Rieder, 19 N.Y.3d 511, 516 (N.Y. 2012).

157. The Defendants were enriched by taking $275,000 from Plaintiff Painter for which he received no value, and by using the Savant Deal – which had been brought to them by

Plaintiff Painter – to engineer a "Pump and Dump" Scheme for which Defendant Shkreli received over one million ($1,000,000) dollars profit, and Plaintiff Painter received nothing.  Defendants were thus unjustly enriched at the expense of Plaintiff Painter.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Edward Painter demands judgment against the Defendants, Turing Pharmaceuticals, aka Vyera Pharmaceuticals and Martin Shkreli, jointly and severally, in an amount no less than $1,000,000, plus treble damages, plus attorneys' fees of no less than $300,000 and the costs and disbursements of this action, and for such other and further relief as to this Court may seem just and proper.

Dated: February 19, 2019

Respectfully Submitted

/s/ Grant Lally
_____
Grant M. Lally
Lally & Misir, LLP
*Attorneys for Plaintiff*
220 Old Country Road
Mineola, NY, 11501
516-741-2666