UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
EDWARD PAINTER,

                          Plaintiff,

    -against-

TURING PHARMACEUTICALS, LLC a/k/a
VYERA PHARMACUETICALS, LLC, and
MARTIN SHKRELI,

                          Defendants.
------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
No. 17-CV-7558 (CBA)(LB)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ SEP 27 2019 ★
BROOKLYN OFFICE

**AMON, United States District Judge:**

      Plaintiff Edward Painter brings this lawsuit against his former employer Turing Pharmaceuticals, LLC and its principal Martin Shkreli to redress various frauds and breaches of contract. (D.E. # 38 ("Am. Compl.").) Before the Court are Defendants' motions to dismiss Painter's Amended Complaint. (D.E. # 35 ("Def. Mot."); D.E. # 39 ("Def. Supp. Br.").) For the reasons stated below, Defendants' motions are granted in part and denied in part.

## BACKGROUND

### I.    Procedural History

      Painter filed this lawsuit on December 28, 2017, "to redress violation[s] of the terms, conditions and privileges of employment of Plaintiff by the Defendants." (D.E. # 1 ("First Compl.") ¶ 1.) His claims included securities fraud pursuant to SEC Rule 10b-5, breach of contract, breach of the implied covenant of good faith and fair dealing, state-law fraud and misrepresentation, and state-law negligent misrepresentation. (Id. ¶¶ 34–91.) These claims arose from three principal contact points between Painter and the Defendants: (1) the parties' employment contract, (2) Painter's purchase of securities from Turing, and (3) an alleged

1

commission deal entered into between Painter and Turing regarding the sale of the drug Benznidazole. (Id. ¶¶ 1–33.)

On December 6, 2018, Defendants moved to dismiss the complaint on two principal grounds. First, Defendants claimed that Painter's claims were barred by a previously undisclosed Separation Agreement, which included a release of "all claims, actions and causes of action . . . arising out of or related to your employment and the termination thereof." (D.E. # 35-2 ("Sep. Agreement") at 3.) Second, they claimed that Painter's Employment Agreement—also previously undisclosed—requires the arbitration of "any claim or dispute related to [Painter's] employment" and "disputes arising out of or related to the employment relationship." (D.E. # 35-1 ("Employ. Agreement") at 9–10.)

In response to these two new documents, Painter stated that "the alleged Separation Agreement may limit the Plaintiff's employment claims, but [that he is] respectfully withdrawing those claims, and cross-moving this Court to allow [him] to amend [his] Complaint." (D.E. # 32 at 11.) Painter did not specify which of his claims were "employment claims" or which claims he specifically withdrew. Because Defendants' motion to dismiss centered on resolving which claims "ar[ose] out of or related to [Painter's] employment," (Sep. Agreement at 3; Employ. Agreement at 9), the Court was unable to determine which of Painter's claims had been withdrawn through Painter's representation.

The Court held oral argument on Defendants' motion to dismiss on February 13, 2019, but counsel for Painter failed to appear. (D.E. dated February 13, 2019.) Eventually, the Court was able to reach Painter's counsel by telephone, but counsel represented that he had not prepared for the conference and that he was not able to discuss the issues raised in Defendants' motion. (Id.) The Court inquired whether Painter still sought leave to amend his complaint to eliminate his

"employment claims" and counsel represented that he did. (Tr. 6:1–20.) The Court granted leave for Painter to file an amended complaint by February 20, 2019. (Id.) Defendants were directed to file a 5-page letter response by March 6, 2019, and Painter was given the opportunity to respond by March 15, 2019. (Id.)

Painter filed an amended complaint on February 20, 2019. (D.E. # 38 ("Am. Compl.").) In accordance with the Court's order, Painter's amended complaint does not state any causes of action premised on the breach of his employment contract. However, Painter used the Court's leave as an opportunity to expand his complaint from five causes of action to eleven. For the first time, Painter now states claims for violation of § 20(a) of the Securities Exchange Act of 1934, (id. ¶¶ 75–80), of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), (id. ¶¶ 81–88), and for unjust enrichment, (id. ¶¶ 150–157). And although Painter withdrew his breach of contract and breach of implied covenant claims based on his employment agreement, he separated his breach of contract and breach of implied covenant claims into distinct claims premised on two securities sale contracts and a commission agreement. (Id. ¶¶ 89–119.) Defendants timely filed a response to the amended complaint, and Painter filed a reply. (Def. Supp. Br.; D.E. # 41 ("Pl. Supp. Br.").)

**II.    Factual History**

Painter's causes of action are premised on the allegedly fraudulent behavior of Defendants with respect to several agreements he allegedly entered into with his former employer, Turing Pharmaceuticals: (1) a commission deal on the sale of Benznidazole (the "Savant Deal"); an agreement to purchase securities in Turing Pharmaceuticals (the "Turing Agreement"); and (3) an agreement to purchase securities in KaloBios, a company controlled by Shkreli (the "KaloBios Agreement"). Each transaction is discussed below.

### A. The Agreements

#### 1. The Savant Deal

In November 2014, several months before Painter entered into an employment agreement with Turing, Painter brought a potential deal involving the exclusive right to market Benznidazole, a drug owned and developed by Savant HWP, Inc., to the attention of Shkreli and Turing's business development executive, Patrick Crutcher. (Am. Compl. ¶ 32.) At that time, Defendants agreed to pay Painter 5% commission on the sale of the drug, and such commissions were expected to gross an excess of $1,000,000. (Id. ¶ 33.) In August 2015, several months after Painter became employed at Turing, he again approached Defendants about the Savant Deal. (Am. Compl. ¶¶ 34, 38.) Defendants again assured him that he would receive commissions if the company acquired the drug. (Id. ¶ 38) In fall 2015, Turing acquired the drugs from Savant. (Id. ¶ 39.)

In November 2015, Shkreli purchased the company KaloBios and became its chief executive officer. (Id. ¶ 43.) At the time of the purchase, Shkreli assured Painter that the acquisition would not impact his management of Turing, that he would sell his shares of KaloBios to Turing at cost, and that KaloBios would become a subsidiary of Turing. (Id. ¶ 44.) He further promised that the drugs purchased from Savant would remain with Turing, managed by the KaloBios subsidiary. (Id. ¶ 45.) However, Shkreli never intended to merge the two companies. (Id. ¶ 48.) On December 3, 2015, Shkreli transferred the Savant Deal to KaloBios for no consideration and began a media campaign to tout KaloBios's acquisition of that drug. (Id. ¶¶ 49–50.) At the same time, Shkreli reiterated that Painter would be paid commission on the Savant Deal. (Id. ¶ 51.) When KaloBios's stock rose by 42% in one day, Shkreli sold his stock for $1,000,000 in profit. (Id. ¶ 52.) "Turing got nothing, and Plaintiff Painter got nothing. Two months later[,] KaloBios filed for bankruptcy." (Id. ¶ 53.) Painter never received his 5% commission. (Id. ¶ 54.)

4

### 2. The Turing Agreement

In July 2015, three weeks after being hired by Turing, Defendants pressured Painter into investing $150,000 of his personal family funds into Turing. (Am. Compl. ¶ 35.) He was told that if he did not invest in Turing, his job would be in jeopardy. (Id. ¶ 36.) Painter invested the funds but never received his Turing securities. (Id. ¶ 37.)

In September 2015, Shkreli acquired the drug Daraprim, used to treat HIV/AIDS, and raised the price of the drug by 5,000%. (Id. ¶ 40.) "The enormous price increase[] affecting a vulnerable population caused massive social outrage resulting in the devaluation of Turing stock – Plaintiff's and shareholder's investments." (Id. ¶ 41.) Prior to acquiring Daraprim, Defendants had represented to Painter that the acquisition of Daraprim would not be accompanied by any price increase. (Id. ¶ 42.) In addition to this alleged misrepresentation, Painter states, as noted above, that the Savant Deal was transferred from Turing to KaloBios for no consideration and that Shkreli misrepresented that KaloBios would become a subsidiary of Turing, despite having no intention to merge the two companies. (Id. ¶¶ 44, 48–49.)

### 3. The KaloBios Agreement

Painter also alleges that in November 2015, when Shkreli purchased KaloBios, Painter was pressured to make a $125,000 investment in KaloBios. (Am. Compl. ¶ 46.) He did so under the misconception that Shkreli intended to merge KaloBios into Turing, (id. ¶¶ 44, 48), and without knowledge of the "'Pump and Dump' scheme" Shkreli was allegedly perpetrating, (id. ¶ 52). After Shkreli sold his stock in KaloBios, it filed for bankruptcy, and Painter did not receive any compensation for his $125,000 investment. (Id. ¶ 54.)

### B. The Employment and Separation Agreements

In its motion to dismiss, Defendants alerted the Court to two other agreements potentially relevant to the resolution of this case: (1) Painter's Employment Agreement, (D.E. # 35-1), and

(2) the Separation Agreement Painter signed when he left Turing, (D.E. # 35-2). These agreements are described below.

### 1. The Employment Agreement

Painter's Employment Agreement is dated June 6, 2015. (Employ. Agreement at 1.) That Agreement contains an arbitration clause requiring the arbitration of "any claim or dispute related to Executive's employment" and "disputes arising out of or related to the employment relationship, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, or harassment," as well as all claims brought under a number of statutes not relevant here. (Id. at 9–10.)

### 2. The Separation Agreement

The Separation Agreement is entitled "Employment Separation Agreement and Releases" and dated October 10, 2017. (Sep. Agreement at 9.) That Agreement provides that Turing will pay a severance payment of $100,000 in exchange for the release of certain claims Painter may have against Turing. (Id. at 1.) Specifically, the Separation Agreement provides:

> In consideration for the above, you agree to forever release, acquit and discharge Turing and all its subsidiaries, affiliates, divisions and its and their present and past employees, officers, directors and shareholders and its and their predecessors, successors and assigns . . . from and against all claims, actions and causes of action . . . , of every kind, nature and description, which exist as of the date you sign this Separation Agreement, arising out of or related to your employment and the termination thereof . . . .

(Id. at 3.) The Separation Agreement contains a second potentially relevant (albeit convoluted) release that reads in relevant part:

> [Y]ou agree to forever release, acquit and discharge Turing . . . from and against . . . all claims arising under all federal, state and local discrimination statutes, including but not limited to your employment with Turing, the terms and conditions of such employment, the termination of such employment and/or any of the events relating directly or indirectly to or surrounding the termination of that employment including, without limitation . . . breach of contract (whether express or implied),

6

> breach of the covenant of good faith and fair dealing, . . . unjust enrichment, . . . , fraud, . . . [and] misrepresentation . . . .

(Id. at 3–4.)

Painter claims that this provision is unenforceable against him because the copy provided by the Defendants was not signed by the Defendants. (D.E. # 32 ("Pl. Br.") at 9–10.) Defendants provided a fully executed version of the Separation Agreement attached to their reply brief, (D.E. # 36-1), although it appears to be the same contract as was originally provided, executed in response to Painter's brief. (Compare D.E. # 36-1 at 9, with D.E. # 35-2 at 9.)

Painter also claims that the Separation Agreement was signed in circumvention of his counsel despite the Defendants knowing that Painter was represented at the time he executed the agreement. (Pl. Br. at 10.) As evidence, Painter has provided a demand letter drafted by his attorney, Grant Lally, on September 26, 2016 sent to Turing to resolve the claims Painter now brings before this Court. (D.E. # 32-3.) Defendants respond that Painter was represented by other counsel, Richard Painter (his brother), during the negotiation of the release and provide an email as evidence of that representation. (D.E. # 37-1.)

\* \* \*

Defendants' motion to dismiss argues that all of Painter's claims should be dismissed on the basis of the claim release in the Separation Agreement or compelled to arbitration based on the arbitration clause in the Employment Agreement. (Def. Mot.) Their supplemental motion to dismiss argues that the Court should not consider the new claims Painter raises for the first time in his amended complaint, (Def. Supp. Br. at 2–3), and that Painter's RICO claim fails to state a claim, (id. at 3–5).

7

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, Painter must allege "sufficient factual matter" to "nudge[]" his claims "across the line from the conceivable to plausible." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2008)). A motion to dismiss should be granted if a complaint's "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." Id. at 679. The Court is "not bound to accept as true a legal conclusion couched as a factual allegation," but must accept all factual allegations, even the "doubtful" ones. Twombly, 550 U.S. at 555.

In addition to Painter's complaint, the Court may consider any document integral to the complaint in deciding Defendants' motion to dismiss. See Global Network Communications, Inc. v. City of New York, 458 F.3d 150, 156–57 (2d Cir. 2006). "In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason— usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." Id. at 157.

A court "may direct that arbitration be held in accordance with [an] agreement at any place therein provided for, whether that place is within or without the United States." 9 U.S.C. § 206. In deciding whether to compel arbitration, "the court applies a standard similar to that applicable for a motion for summary judgment." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003). "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." AT&T Techs., Inc. v. Commc'ns. Workers of Am., 475 U.S. 643, 649 (1986).

## DISCUSSION

### I. Leave to Amend

Before addressing the merits of Painter's eleven claims, the Court must address a preliminary issue. Painter's initial brief in opposition to Defendants' motion to dismiss "respectfully withdr[e]w[]" his "employment claims" and "cross-mov[ed] this Court to allow [him] to amend [his] Complaint." (Pl. Br. at 11.) The Court granted leave to amend at oral argument for the limited purpose of allowing him to withdraw his "employment claims." Specifically, the Court and counsel for Painter had the following exchange:

> THE COURT: One of the things that you said in response to this, and I do not know if you remember this, but in your papers you said that you were going to file an amended complaint which would drop a number of the causes of action that you believe may have been related to the employment contract. Have you done that?
>
> MR. LALLY: I do not know off – off the – from sitting here outside of my office, I do not know that. I – but I do know that that was our – that was our representation, that we would make – that we would agree to drop some of the counts that specifically related to –
>
> THE COURT: All right. Here is what I want you to do: Within a week from today, I want you to file that amended complaint, okay, that drops the –
>
> MR. LALLY: Yes, Your Honor.
>
> THE COURT: So a week from today is February 20th. So by February 20th you drop the causes of action that you believe apply to the employment contract and file an amended complaint.

(Tr. 6:1–20.) However, in addition to withdrawing some claims based on breach of his Employment Agreement, Painter's amended complaint added claims for violation of § 20(a) of the Securities Exchange Act of 1934, RICO, and an unjust enrichment claim as well as three new breach of contract claims. (Am. Compl. ¶¶ 75–88, 150–157.) Defendants ask the Court to disregard these new claims, which they argue were filed without leave. (Def. Supp. Br. at 2–3.)

Decisions about whether to consider an amended complaint rest within the discretion of the district court. Iqbal v. Ashcroft, 574 F.3d 820, 822 (2d Cir. 2009) (per curiam). Although Painter's Amended Complaint exceeds the scope of the limited leave to amend granted by the Court, Painter may still amend his complaint with the Court's leave if "justice so requires." Fed. R. Civ. P. 15(a)(2). "The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993). "Delay alone . . . does not usually warrant denial of leave to amend." Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 234–35 (2d Cir. 1995).

Painter took advantage of the Court's limited leave to remove his employment claims by filing a number of new claims, and the Court admonishes him for doing so. Nonetheless, the Court grants leave and accepts his amended complaint. Defendants have not argued that the new claims in the amended complaint were filed in bad faith or prejudiced them in any way. (Def. Supp. Br. at 2–3.) Nor could they. Although the amended complaint was filed more than a year after the original complaint was filed, motion practice did not begin until late 2018, and discovery is not yet underway. (D.E. # 32–37.) Further, the Defendants were given the opportunity to respond to the new allegations in the amended complaint—which they did, (Def. Supp. Br.)—and declined further opportunity to respond at oral argument on March 29, 2019. Because Painter's new claims arise out of the same operative facts as his original claims, the Court accepts the amended complaint. See, e.g., Saxholm AS v. Dynal, Inc., 938 F. Supp. 120, 124 (E.D.N.Y. 1996) (amendment appropriate where new claims "would involve most of the exact same facts, circumstances, and questions of law" and where denial "would simply multiply proceedings in this court with no apparent benefit to the parties").

## II.   Merits

All of Painter's claims relate to Painter's two securities purchase agreements and his commission agreement. Defendants move to dismiss these claims on the grounds that they are barred by the release of claims in the Separation Agreement and move to compel these claims to arbitration based on the arbitration clause in the Employment Agreement. The Court will consider both of these documents at this stage because they are integral to the amended complaint. See Global Network, 458 F.3d at 156 (noting that "[i]n most instances where [documents are considered integral to the complaint] . . . the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim"). Defendants also move to dismiss Painter's RICO claims on several other grounds. The Court discusses both arguments in turn.

### A. The Employment and Separation Agreements

The release of claims contained in the Separation Agreement and the arbitration clause contained in the Employment Agreement contain materially identical language. The Separation Agreement releases all claims "arising out of or related to [Painter's] employment and the termination thereof."[1] (Sep. Agreement at 3.) His Employment Agreement demands arbitration of "disputes arising out of or related to the employment relationship." (Employ. Agreement at 9–10.) Because the Court determines that this language does not bar any of Painter's remaining

---

[1] For the first time at oral argument, counsel for Defendants indicated he also relied on the enumerated list of claims he alleges were released on Page 4 of the Separation Agreement. This list of claims is contained in a provision that is grammatically incoherent. (See Sep. Agreement at 34 ("all claims arising under all federal, state and local discrimination statutes, including but not limited to . . . your employment with Turing . . . .").) In any event, the list of claims is expressly related to "the events related directly or indirectly to or surrounding the termination of [Painter's] employment." (Id.) Painter has not alleged nor have Defendants argued that he was terminated under circumstances related to the claims he brings in this lawsuit. Because the enumerated claims released under this section are only those related to the termination of Painter's employment, the Court declines to read the section to broaden the "arising out of or related to" language mentioned above.

causes of action, the Court declines to address the issue of whether the Separation Agreement is enforceable.

The merits of Defendants' motions to dismiss and compel arbitration turn on whether Painter's causes of actions "relate[] to" or "arise out of" his employment. The Second Circuit has stated that "unless it can be said 'with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute,' the dispute should be submitted to arbitration." Concourse Village, Inc. v. Local 32 E. Service Employees Int'l Union, 822 F.2d 302, 304 (2d Cir. 1987) (quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582–83 (1960)).

Nonetheless, there are limits to even broadly worded agreements. The Supreme Court has noted in a different context that "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy," it would not function as a limit because "really, universally, relations stop nowhere." New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655 (1995) (internal alterations omitted). The Fifth Circuit has interpreted "a dispute 'related to' a plaintiff's employment" to require "a significant relationship to the [employment] contract." Jones v. Halliburton Co., 583 F.3d 228, 238 (5th Cir. 2009) (quoting Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd., 139 F.3d 1061, 1067 (5th Cir. 1998)). The Ninth and Eleventh Circuits have held that "'related to' marks a boundary by indicating some direct relationship." Doe v. Princess Cruise Lines, Ltd., 657 F.3d 1204, 1218 (11th Cir. 2011); United States ex rel. Welch v. My Left Foot Children's Therapy, LLC, 871 F.3d 791, 798 (9th Cir. 2017). Put another way, claims do not "relate to" employment where "the defendant 'could have engaged in' the same conduct 'even in the absence of any contractual or employment relationship with the plaintiff,' and a third party 'could have brought the same claims based on virtually the same alleged facts.'"

Welch, 871 F.3d at 799 (quoting Princess Cruise Lines, 657 F.3d at 1219–20) (internal alterations omitted); see also Mikes v. Strauss, 889 F. Supp. 746, 754 (S.D.N.Y. 1995) (finding qui tam claims not covered by arbitration clause because they "in no way impinge on [plaintiff's] employment status" and "[e]ven if plaintiff had never been employed by defendants . . . she would still be able to bring a suit against them for presenting false claims to the government"). In short, the Court must determine which of Painter's claims are independent from his employment and which bear "some direct relationship."

### 1. Securities Fraud

Painter asserts three claims sounding in securities fraud. His § 10(b) and Rule 10b-5 securities fraud claims are premised on alleged "material misrepresentations and omissions" made by Defendants "to induce investments by [Painter] in its securities." (Am. Compl. ¶ 62.) His § 20(a) securities fraud claim seeks to hold an undisclosed supervisory individual liable for the same conduct. (Id. ¶¶ 75–80.) And his RICO claims seek to hold Defendants liable for a "pattern and practice" of securities fraud. (Id. ¶ 88.) Painter also pled that he "was told that if he did not invest the funds, his job would be in jeopardy." (Id. ¶ 36.)

The Court concludes that Painter's securities fraud claims "relate to" his investor/investee relationship with Turing rather than his employee/employer relationship and therefore are not subject to either the arbitration clause in the Employment Agreement or the release of claims in the Separation Agreement. That is because "the defendant could have engaged in the same conduct even in the absence of any contractual or employment relationship with the plaintiff." Welch, 791 F.3d at 799 (internal quotation marks omitted). Specifically, Turing could have defrauded Painter as a Turing and KaloBios investor, whether or not he was also a Turing employee.

The Court's decision that the securities fraud claims do not have "some direct relationship," Princess Cruise Lines, 657 F.3d at 1218, stands in some tension with Painter's own pleading that

13

he "was told that if he did not invest the funds, his job would be in jeopardy." (Am. Compl. ¶ 36.) But the question of whether Painter's <u>investment</u> in Turing stock was connected with the terms of his employment is separate from the question whether his <u>securities fraud claim</u> was connected with his employment. The question the Court must answer is "whether the particular <u>dispute</u> sought to be arbitrated falls within the scope of the arbitration agreement." <u>Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.</u>, 246 F.3d 219, 226 (2d Cir. 2001) (emphasis added). If Painter brought a wrongful termination claim because he was fired for refusing to invest in Turing stock, that dispute would "relate to" his employment relationship rather than his investment relationship. But Painter's claims are for securities fraud. He alleges that his investments were induced by material misrepresentations. He was no more susceptible to these misrepresentations than any non-employee investor in Turing despite his status as a Turing employee.

### 2. Fraud and Misrepresentation, Negligent Misrepresentation

Analysis of Painter's fraud and misrepresentation claim is similar. Under New York law, "[t]o establish a prima facie case for fraud, plaintiffs would have to prove that (1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss." <u>Ross v. Louise Wise Servs., Inc.</u>, 868 N.E.2d 189, 195–96 (N.Y. 2007) (internal quotation marks, alteration, and citation omitted).

Painter alleges that, as a result of Shkreli's and Turing's misrepresentations, he entered into a commission agreement with Turing with respect to the drug Benznidazole, (Am. Compl. ¶ 124), and invested $275,000 of his personal funds into Turing and KaloBios, (Am. Compl. ¶ 122). Much like the securities fraud claims discussed above, these claims are premised on a business deal entered into between Painter and Turing as well as his investor/investee relationship with Turing.

14

In other words, "the defendant could have engaged in the same conduct even in the absence of any contractual or employment relationship with the plaintiff." Welch, 871 F.3d at 799 (internal quotation marks omitted). This claim is therefore not barred.

Finally, under New York law, "[a] claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." J.A.O. Acquisition Corp. v. Stavitsky, 863 N.E.2d 585, 587 (N.Y. 2007). The "special or privity-like relationship" Painter alleges he shared with Turing is that "Defendants had a special duty to the Plaintiff – an investor in Turing's stocks – to provide correct information as to investments in Turing." (Am. Compl. ¶ 135.) Because this claim is premised on his investor/investee relationship with Turing, it does not fall within the scope of the arbitration clause or release of claims.

In sum, none of Painter's claims sounding in fraud and misrepresentation are barred by either of his agreements with the Defendants.

### 3. Breach of Contract/Unjust Enrichment/Implied Covenant of Good Faith

Painter states five causes of action sounding in contract or quasi-contract. First, he alleges that the Defendants breached the Savant Deal by failing to pay him 5% commission on the sale of Benznidazole. (Am. Compl. ¶ 95.) Second, Painter alleges that the Defendants breached his contract to purchase securities in Turing by failing to deliver the securities. (Id. ¶ 101.) Third, he alleges that the Defendants breached their contract to deliver securities in KaloBios. (Id. ¶ 109.) Fourth, he alleges that the Defendants' failure to deliver both sets of securities breached the implied covenant of good faith and fair dealing. (Id. ¶ 119.) And finally, Painter alleges that the same facts giving rise to his three breach of contract claims give rise to a cause of action for unjust enrichment. (Id. ¶¶ 150–157.)

Each of these causes of action arises out of either the commission agreement or the securities exchange agreements discussed above in relation to Painter's fraud claims. As with those claims, "the defendant[s] could have engaged in the same conduct even in the absence of any . . . employment relationship with the plaintiff." Welch, 871 F.3d at 799 (internal quotation marks omitted). The claims are therefore not barred by the "arising out of" and "related to" language of the Employment and Separation Agreements.

### 4. Breach of Fiduciary Duties

Finally, Painter alleges that Defendants breached fiduciary duties owed to him. Under New York law, "[i]n order to establish a breach of fiduciary duty, a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct." Kurtzman v. Bergstol, 835 N.Y.S.2d 644, 646 (2d Dep't 2007). Painter claims that "Defendants had a fiduciary relationship to [him] based on [his] investments totaling $275,000.00 in the Defendant, Turing." (Compl. ¶ 95.) Because this claim is premised on Painter's investment relationship with Turing rather than his employment relationship, the Court declines to compel arbitration or dismiss it.

\* \* \*

Because none of Painter's remaining claims "relate to" or "arise out of" his employment with Turing, the Court declines to compel them to arbitration or to dismiss them.

### B. RICO Claims

Defendants seek dismissal of Painter's § 1962 RICO claims on the additional basis that they are barred by § 1964(c). (Def. Supp. Br. at 3–5.) That provision provides that "[a]ny person injured in his business or property by reason of a [RICO] violation . . . may sue therefor . . . except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). Painter's

16

Amended Complaint clearly states that the "racketeering activity" allegedly committed by defendants involves "engaging in fraud in the sale of securities." (Am. Compl. ¶ 84.) Nonetheless, Painter argues that his claims may proceed because § 1964(c) does not bar a RICO claim premised on securities fraud so long as the defendant "is criminally convicted in connection with the fraud." 18 U.S.C. §1964(c); (Pl. Supp. Br. at 5). Martin Shkreli was convicted of securities fraud on August 4, 2017 for conduct undertaken at MSMB Capital, MSMB Healthcare, and Retrophin. See United States v. Shkreli, No. 15-CR-637 (KAM), D.E. # 305 (Aug. 4, 2017).

Painter cannot take advantage of the criminal conviction exception to § 1964(c)'s bar of RICO claims premised on securities fraud because Shkreli was not convicted of securities fraud for the fraud giving rise to Painter's RICO claims. Section 1964(c) allows civil RICO claims premised on fraud to go forward only when the defendant "is criminally convicted in connection with the fraud." The plain language of that provision requires a defendant to be convicted of the same fraud giving rise to the RICO claims, not <u>any</u> fraud, or some related fraud as argued by Painter. (Pl. Supp. Br. at 5.) In reaching this conclusion, the Court agrees with the thorough opinion of Judge Marrero, which ultimately concluded "that RICO's criminal conviction exception must be interpreted as narrowly as possible" and that "[a]ccordingly . . . the exception is 'only available to those plaintiffs against whom a defendant has specifically been convicted of criminal fraud.'" Kaplan v. S.A.C. Capital Advisors, L.P., 104 F. Supp. 3d 384, 389 (S.D.N.Y. 2015) (collecting cases from other districts, holding the same).

Painter attempts to dispute the reasoning of Kaplan by arguing that "[t]he Defendants are precisely the type of defendant envisioned by Congress who should be held accountable by the civil RICO laws" because "their pattern and practice of outright fraud upon innocent investors . . . will only serve to weaken our Nation's economic system and undermine confidence in the integrity

of our securities markets—precisely the result that civil RICO is designed to check and deter." (Pl. Supp. Br. at 4.) But the legislative history of § 1964(c) suggests that civil RICO's purpose in the securities fraud context is exactly the opposite. "Congress, by enacting this amendment, was intending to correct the misapplication of RICO in the securities fraud context." Krear v. Malek, 961 F. Supp. 1065, 1076 (E.D. Mich. 1997). As the Second Circuit has noted, the purpose of § 1964(c)'s bar "was to prevent litigants from using artful pleading to boot-strap securities fraud cases into RICO cases, with their threat of treble damages." MLSMK Inv. Co. v. JP Morgan Chase & Co., 651 F.3d 268, 274 (2d Cir. 2011) (internal quotation marks omitted). The purpose of § 1964(c)—passed as part of the Private Securities Litigation Reform Act of 1994—thus supports a narrow reading of the criminal conviction exception rather than the broad one advocated by Painter.

Finally, Painter argues that even if the Court construes the criminal conviction exception narrowly, he "remains eligible to seek relief under civil RICO because the evidence will show that he was a potential investor in MSMB Capital, MSMB Healthcare, and Retrophin, and therefore a named victim of Defendants' crimes in the indictment." (Pl. Supp. Br. at 5.) This argument is a red herring. Even if Painter was a victim of Shkreli's MSMB/Retrophin fraud, his civil RICO claim is premised on a fraud involving Turing for which Shkreli was never charged nor convicted.

Further, the Court doubts that Painter was a victim of the fraud for which Shkreli was convicted. Although Shkreli's indictment refers to "a scheme to defraud investors and potential investors" in MSMB Capital, MSMB Healthcare and Retrophin, United States v. Shkreli, No. 15-CR-637 (KAM), D.E. # 60 ¶ 7 (June 3, 2016) (emphasis added), Painter has not alleged in his complaint that Shkreli made any material misrepresentations to him as a potential investor in these companies. If Painter is arguing that he was a victim of Shkreli's fraud because, in the abstract,

he <u>could</u> have invested in these companies, that interpretation of the criminal conviction exception would allow the exception to swallow the rule. Retrophin was a publicly traded company for portions of Shkreli's fraud. Id. ¶ 1. Under Painter's interpretation, everyone was a "potential investor" of the Retrophin scheme, a victim of the same, and therefore able to take advantage of the criminal conviction exception with respect to any allegations against Shkreli, whether or not related to his Retrophin fraud conviction. This interpretation is inconsistent with the narrow scope of the criminal conviction exception this Court has deemed appropriate.

As such, Painter's civil RICO claims against the Defendants are dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motions are granted in part and denied in part. The Court dismisses Painter's RICO claims. The Court declines to compel or dismiss Painter's remaining claims.

SO ORDERED.

Dated: September 26, 2019
Brooklyn, New York

s/Carol Bagley Amon
Carol Bagley Amon
United States District Judge